[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF THE CASE
The two count complaint at issue here alleges that on or about October 7, 1997, the plaintiff, Kronberg Brothers, Inc., entered into a written contract with the defendants, John Steele and Eileen Steele, for a number of improvements to the defendants' home located in New Haven, Connecticut. The plaintiff commenced work in early October 1997. During the course of construction the plaintiff undertook extra work as evidenced by change orders to the contract. In November, 1997, a dispute arose as to the scope, cost, and quality of the work being provided by the plaintiff and its subcontractors. Shortly thereafter the plaintiff left the job-site and furnished a final bill to the defendants for the amount of $17,164.11. After the defendants failed to pay the sum upon demand, the plaintiff filed a mechanic's lien February 25, 1998 on the defendants' premises and recorded the lien on the New Haven land records. The plaintiff has also filed a lis pendens against the premises. To date the defendants have not paid the sum claimed.
The plaintiff alleges a cause of action in foreclosure of the mechanic's lien and possession of the premises, breach of contract and unjust enrichment with damages totaling $17,028.91, as well as costs of collection including interest and attorney's fees.
On July 29, 1998, the defendants filed their answer, special defenses, and counterclaims. In the first special defense the defendants allege the plaintiff failed to comply with the Home Improvement Act, General Statutes § 20-429 in various ways. In the second special defense the defendants allege the plaintiff failed to obtain the proper permits in violation of the building code in effect at the time. In the third special defense the defendants allege the amount of the lien claimed by the plaintiff is excessive, inaccurate billing was used, and was filed in bad faith, in violation of General Statutes § 49-34. In addition the defendants have filed a three count counterclaim alleging violations of the Home Improvement Act, breach of contract, bad faith, and CUTPA violations. Under their counterclaims, the defendants seek money damages, interest, attorney's fees, costs, and punitive damages.
Because the validity of the contract is determinative of many of the claims of both the plaintiff and the defendants, this question will be addressed first. CT Page 13673
 DISCUSSION I
The defendant argues that the contract relied on by the plaintiff is invalid because it does not comply with the Home Improvement Act, (HIA), in particular that it did not contain a proper notice of the homeowners' cancellation rights.
This notice requirement is set forth in § 20-429(a)(6) of the HIA. That section incorporates by reference the detailed notice provision of § 42-135a(2), the Home Solicitation Sales Act, (HSSA).
Specifically, Section 20-429(a)(6) reads as follows:
 "No home improvement contract shall be valid or enforceable against an owner unless it: . . . (6) contains a notice of the owner's cancellation rights in accordance with the provision of Chapter 740,".
Chapter 740, the HSSA, encompasses several statutory requirements including definitions and § 42-135a, entitled "Notice in sales agreement. Notice of cancellation. Duties of seller." and states:
 "No agreement of the buyer in a home solicitation sale shall be effective if it is not signed and dated by the buyer or if the seller shall: (1) Fail to furnish the buyer with a fully completed receipt or copy of all contracts and documents pertaining to such sale at the time of its execution, which contract shall be in the same language as that principally used in the oral sales presentation and which shall show the date of the transaction and shall contain the name and address of the seller, and in immediate proximity to the space reserved in the contract for the signature of the buyer. or on the front page of the receipt if a contract is not used, and in boldface type of a minimum size of ten points, a statement in substantially the following from:", (emphasis added).
The required notice language follows, then subsection 2, followed by the required text of the cancellation notice.
The plaintiff's agreement is that the only requirement of Chapter 740 which applies is that the cancellation notice be in the form set forth in the HSSA noted above. In effect, the plaintiff claims section 6 does not CT Page 13674 refer to the form of the HSS contract.
The court finds this argument unpersuasive. It would seem logical that if that is what the legislature intended, it would not have used the broad language of section 6 that notice of the owner's cancellation rights be in accordance with Chapter 740 — which the court interprets to mean all of Chapter 740.
The other obvious fallacy in the plaintiff's reasoning is that the HIA contains no other provision governing cancellation notices. A reading of that act, especially § 20-429, lends to the inescapable conclusion that the legislature took the logical course of action and decided that cancellation notices under the HIA should be those set forth in the HSSA.
Thus, these two acts, read and implemented together comprise a single, lucid and precise statement with an announced purpose.
To apply the plaintiff's reasoning to interpret § 42-135a leaves two separate and distinct procedures for what was obviously intended to be the same procedure for similar items.
The contract documents violate § 42-135a(1) in that the required cancellation notice does not appear "in immediate proximity to the space reserved in the contract for the signature of the buyer."
In fact, the notice in question appears entirely on a separate sheet.
 II
Assuming for the sake of argument that the plaintiff's explanation that subsections 2 and 3 of § 42-135a apply, the plaintiff is faced with yet another invalidating factor.
Subsection 3 requires that before furnishing copies of the "Notice of Cancellation" to the buyer, the seller must complete both copies and enter, inter alia, the date of the transaction and the date not earlier than the third business day following the date of the transactions, by which the buyer may give notice of cancellation.
No cancellation notice produced in evidence satisfies this requirement, so that the contract must fail on this score as will.
 III
The plaintiff makes the further argument that the 1993 amendments to CT Page 13675 the HIA should be utilized by the court to avoid an inequitable result in denying the plaintiff's attempt to recover the claimed balance.
There is no merit to this claim because a contractor seeking these benefits must have first complied with subdivisions of § 20-429, including the one dealing with notices of cancellation. These deficiencies have been thoroughly discussed above.
 IV
While the plaintiff relies on Wright Bros. Builders, Inc. v. Dowling,247 Conn. 218 (1998), that reliance is misplaced.
That case dealt with deviations in the requirements deemed to be of a minor and highly technical nature — the receipt of a single copy of the cancellation notice by each buyer and the ready availability of the missing information.
The deviations in this case cannot be characterized as minor and go to the essence of the statutes as adopted.
The Wright case is conclusive of the plaintiff's claims discussed in Sections I and II above as to the applicability of § 42-135a(1) to the contract in this case. At page 227, the court states: "Because §20-429(a)(6) incorporates the provision of the HSSA by reference, . . ." This is a clear and unequivocal pronouncement of what the court has concluded above, viz, that all of the cancellations notice requirements are applicable to § 20-429(a)(6).
A final comment as to the components of the disputed contract is necessary. As presented, the contract itself consisted of the original agreement and two addenda calling for additional work. The second addendum was never signed, so that standing alone it is invalid, even if the court is found to be in error on the effect of the cancellation notice.
 V
The plaintiff also overlooks Section 20-429(e) which states:
 "Each home improving contract entered into shall be considered a home solicitation sale pursuant to chapter 740 and shall be subject to the requirements of said chapter regardless of the location of the transaction or of the signing of the contract."
CT Page 13676 It is not disputed that the contract m question is a home improvement contract. By virtue of the above language, as noted above in Section I, Section 42-135a applies.
That section was also violated because the plaintiff failed "to furnish the buyer with a fully completed receipt or copy of all contracts and documents pertaining to such sale at the time of its execution, . . . ."
As related by the plaintiff, the contract documents were delivered or faxed piece meal, some on September 29th and others on October 1st. The basic contract was signed by the buyers on October 7th. A "payment authorization" was obtained from the buyers before they signed anything. Undated and incomplete cancellation notices were faxed on at least two occasions.
The contract must fail also by virtue of this defect.
 VI
The plaintiff has recited a series of "neglects of contractual duties" which he claims constitute bad faith on the part of the defendants. Thus, they should be precluded from defending against the plaintiff's contract claims.
In order to constitute such bad faith, the acts must involve a dishonest purpose. And, none of the acts alleged were committed prior to the execution of the disputed contract. There is no evidence that the defendants did anything to create the defects in the cancellation notice.
The plaintiff's claims are similar to those raised in WadiaEnterprises, Inc. v. Hirschfield, 224 Conn. 240 (1992). At page 249, the Supreme Court said:
 "The essence of the remainder of the plaintiff's allegations is that the defendants acted in bad faith by initially enforcing the contract and subsequently asserting the contract's invalidity as a defense to a suit by the contractor. This contention does not, by itself, present a claim of bad faith. There is nothing dishonest or sinister about homeowners proceeding on the assumption that there is a valid contract, enforcing its provisions, and later, in defense to a suit by the contractor, upon learning that the contract is invalid, then exercising their right to repudiate it." CT Page 13677
The balance of the acts complained of arose out of the deteriorating relationship between the parties and can hardly be held to be actions in bad faith when the defendants were confronted with what must have been an exasperating ordeal. The plaintiff overlooks the evidence presented in this trial which hardly depicts a neat, orderly and efficient project proceeding on time and without delay.
The bad faith claim must be rejected.
 CONCLUSION AS TO THE COMPLAINT
On the basis of the above discussion, the court concludes that the contract in question is invalid because it fails to satisfy the requirements of Sections 20-429 and 42-135a. These violations constitute unfair or deceptive acts or practices under § 42-110b of the Connecticut Unfair Trade Practices Act (CUTPA), pursuant to § 42-141(b) of the General Statutes. The plaintiff cannot recover on this count, either under the contract itself, quantum meruit, or unjust enrichment. (Wright Bros. Builders, Inc. v. Dowling, supra).
In view of the court's decision as to the contract, the lis pendens and mechanics lien filed by the plaintiff on the New Haven land records are ordered released and discharged.
 DISCUSSION RE: DEFENDANTS' CLAIMS I
The defendants have asserted a variety of claims against the plaintiff for overcharges, defective work, the cost to finish the project and the cost of repairing defective work.
They have also asked for punitive damages under CUTPA, interest, attorney's fees and money damages.
 A.
The plaintiff's performance in connection with the tile floor in the kitchen is probably the worst example of mis-feasance in this case. The tile work was assigned to a sub contractor who proceeded to install the tile despite the existence of a noticeable "hump" on the floor. When questioned by Mrs. Steele, his position was that the preparation of the surface was not his responsibility. CT Page 13678
Mrs. Steele's call to the plaintiff was met with the response that Mr. Babula, the supervisor or foreman of the project, was on vacation. Mrs. Steele testified that Mr. Lemme, a plaintiff's agent, who spoke to her then threatened to "shut down the job." Though Mr. Lemme denies this, the plaintiff chose to do nothing and let the tile contractor finish the job.
All of this occurred while the Steeles and their children were out of the house because of all of the work going on. Mrs. Steele was living in Bridgeport with her children and the family's routines had been completely disrupted.
Confronted with this claimed defect is the brand new tile floor, the plaintiff's employees, Babula and Lemme, then assured the Steeles that once a closet in the basement, under the "hump," was removed, a settling would take place.
This settling was stated to occur first in a matter of weeks and then to within a year. But the plaintiff didn't proceed to remove the closet then, though it was supposed to have been done originally, a fact admitted by Mr. Babula.
It would serve no purpose to comment further on the sordid details of this portion of the plaintiff's work. It is obvious from the evidence that the floor was level before the Steeles decided to have the plaintiff replace the surface with tile. When the old material and the underlayer was removed, the plaintiff did not prepare a level surface for the tiling job.
Then, to permit the subcontractor to apply tile to a defective surface without even considering the owner's concerns is hardly a professional response. There were other problems with this tile application, the kitchen cabinets and the counter top, all of which had to be corrected by a different contractor.
The cost of repairing this floor sky-rocketed after the tile was laid, whereas had it been corrected beforehand, the cost would have been minimal.
To have the tile installation proceed improperly because Mr. Babula was on vacation was an example of indifference toward the homeowners. Why Mr. Kronberg did not intercede remains unexplained.
 B.
The court is especially concerned about the failure of the plaintiff to obtain permits for the work it performed. The plaintiff's electrician CT Page 13679 admitted that a permit was required and it is appalling to hear testimony that live wires were sealed behind closed walls in at least three locations. The plaintiff's response to the effect that these conditions would have been addressed is preposterous — and the court wonders what the plaintiff had in mind. The walls had been sealed and painted and apparently no one had paid any attention to the state of the premises.
A local building official testified that a job of this magnitude required a building permit and that the electrical work also dictated a permit be applied for. He recited the code violations.
The plaintiff's expert agreed that an electrical permit was required and he was not made aware that a window had been sealed up and a new one cut in when he stated a building permit was not necessary. Nor was he aware of the relocation of the utility lines.
Finally, the court notes the plaintiff included a charge for permits in its summary of charges, yet not a single one was issued for this project.
 C.
In addition to the above major complaints, the court is aware of the detailed list submitted by the defendants (Exhibit I) and has considered the testimony of both defendants; Kenneth Carney, who did the corrective work in the kitchen; Joseph Raiola, the defendants' expert; and has reexamined the testimony of the plaintiff's employees.
The overall impression created in the court's mind is that this project became a deplorable mess. Exhibit 17, a photograph of a baseboard heating unit, is a glaring example. The heating fins have been crushed together into a solid mass. When questioned about what would be done to correct this obvious act of carelessness, the plaintiff's employee said they would get a pair of pliers and straighten them out.
Though never indicated anywhere in writing, the plaintiff sought to charge the defendants an extra $1,245.00 for a different stain than the one "allowed" under the contract details. While the plaintiff argues that Mrs. Steele agreed to this increase, the evidence offered in support of that claim (Exhibit BB) discloses no such thing. There is no evidence of an "allowance" or a change order increasing an "allowance."
The court also notes the dates of the documents comprising the "contract," the completion date on the basic contract, the lack of such dates on the two addenda, and the state of the project as reflected in Mr. Steeles letter of January 23, 1998 (Exhibit I), offered by the CT Page 13680 plaintiff.
After the passage of over three months, and Steele's letter outlining numerous problems, the plaintiff's response was to send the defendants an itemized bill, without explanation, (Exhibit 2).
This was after the family had lived through the construction, a period of dislocation, numerous conversations about the state of the job and heated disagreement over the tile installation.
The sum total of all of the above dictates the conclusion that the plaintiff in various and numerous instances was guilty of business practices which the CUTPA seeks to discourage and punish.
These defendants lost time from work and had to spend over $6,000 for corrective work, as well as the disruption of their lives noted above.
 CONCLUSION AS TO DEFENDANTS' COUNTERCLAIMS
It is the conclusion of the court that the plaintiff's actions with respect to this entire transaction warrant the sanctions permitted under CUTPA, specifically for:
1. Violation of the cancellation notice provisions as noted above;
2. Violations of CUTPA in:
a. Failing to secure required permits;
 b. Performing work in an unworkmanlike and negligent manner;
c. Refusing to correct defective work;
d. Charging the defendants for permits not issued;
 e. Engaging in otherwise unethical and improper business practices calculated to deceive the defendants and to cause them to act to their detriment and to incur great expense and inconvenience.
It is therefore the judgment of the court that the defendants recover from the plaintiff as punitive damages the sum of $13,500. CT Page 13681
The defendants shall also be entitled to taxable costs.
The defendants are awarded reasonable attorney's fees which will be determined after a post judgment hearing at which the plaintiff may be heard.
Anthony V. DeMayo Judge Trial Referee